# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * *    *
I.D.,                                       *
                                            *    No. 04-1593V
                  Petitioner,               *    The Honorable Susan G. Braden
                                            *    Special Master Christian J. Moran
v.                                          *
                                            *    Filed: April 19, 2013
                                            *    Reissued: May 14, 2013[1]
SECRETARY OF HEALTH                         *
AND HUMAN SERVICES,                         *
                                            *    Damages, attendant care, lost
                  Respondent.               *    earning capacity, emotional
                                            *    distress
* * * * * * * * * * * * * * * * * * * *    *
```

Mark P. Friedlander, Jr., McLean, VA, and Mark Greenspan, Norfolk, VA, for petitioner;
Heather L. Pearlman, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED RULING REGARDING DAMAGES, INCLUDING ATTENDANT CARE AND AMOUNT OF PAIN AND SUFFERING

I.D. established that a hepatitis B vaccination given to him in 2001, when he was 10 years old, caused him to suffer chronic fatigue syndrome. Memorandum Opinion and Final Order, filed Apr. 22, 2011 (released for publication on May 9,

---

[1] At a status conference held on April 26, 2013, petitioner orally moved for redaction of petitioner's name to petitioner's initials. Respondent indicated that she took no position on petitioner's request. Petitioner's oral motion was granted. This ruling is being reissued in accord with the petitioner's request to redact his name.

2011).  This finding entitled I.D. to compensation as defined in 42 U.S.C. § 300aa–15(a). [2]

The parties have been investigating the extent of I.D.'s injury.  Although in the vast majority of Vaccine Program cases, the parties reach an agreement regarding the amount of compensation, here, the parties have been unable to resolve all issues.  I.D. and the Secretary have two areas of dispute.  First, the parties disagree over how much compensation for I.D.'s pain and suffering is appropriate within the strictures of the Vaccine Act.  Second, the parties have not reached an agreement as to the degree of attendant care needed by I.D.

The resolution of these issues is set forth below.  First, an appropriate amount of attendant care is an amount that is a compromise between the positions of the parties.  Second, an appropriate amount of pain and suffering is $250,000.00, of which $100,000 is for past pain and suffering and $150,000 is for future pain and suffering.

**Procedural History**

Thus far, there have been two decisions by the undersigned special master, both of which found that I.D. was not entitled to compensation.  Dobrydneva I, 2010 WL 2143481 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); Dobrydneva III, 2010 WL 8106881 (Fed. Cl. Spec. Mstr. Oct. 27, 2010). [3]  The Court of Federal Claims has issued two orders.  The first order, Dobrydneva II, 94 Fed. Cl. 134 (2010), vacated Dobrydneva I.  The second order, Dobrydneva IV, 98 Fed. Cl. 190 (2011), reversed Dobrydneva III.  In its first Opinion and Order, the Court found, as a matter of fact, that I.D. suffers from chronic fatigue syndrome.  Dobrydneva II, 94 Fed. Cl. at 146.  In its second Opinion and Order, the Court found that the hepatitis B vaccine caused his chronic fatigue syndrome.  Dobrydneva IV, 98 Fed. Cl. at 206-11.  Since the issuance of Dobrydneva IV, the parties have been investigating the amount of damages to which I.D. is entitled.

The Vaccine Act establishes categories of compensation for the vaccinee's injuries.  The special master may award compensation for (1) future unreimbursable medical expenses, see section 15(a)(1)(A); (2) past unreimbursable

_____

[2] All references hereinafter to the statutory provisions governing the Vaccine Act are to the relevant subsection of 42 U.S.C. § 300aa.

[3] At the time of previous adjudications, I.D.'s parents were the petitioners. In accord with the Russian language, the last name of his mother is D.

medical expenses, see section 15(a)(1)(B); (3) lost earnings that are restricted for people whose injury occurred before age 18 and that are unlimited for people whose injury occurred after age 18, see section 15(a)(3); and (4) "actual and projected pain and suffering and emotional distress," section 15(a)(4).[4] Compensation shall be "determined on the basis of the net present value." Section 15(f)(4)(A).

Within days of the Court's second Opinion and Order that found I.D. was entitled to compensation, the undersigned issued a standard order regarding damages. The order was intended to offer the parties a basic overview of the process. In doing so, the order set forth discount rates that special masters have routinely used and indicated that the parties could present expert testimony. Order, filed April 25, 2011, at 6. Neither party, however, submitted any testimony regarding discount rates.

Status conferences regarding damages have been held approximately every month since May 2011. Even with the special master's participation, the process for quantifying the amount of compensation to which I.D. is entitled was not straightforward. At several points, it appeared that the parties were prepared to submit particular issues for adjudication, when one party (usually I.D.) requested an opportunity to do something – to gather more evidence, to consult another expert or to file a brief.[5] These fits and starts are set out below to explain how the issues requiring adjudication were developed.

Following a common practice in Vaccine Program cases, each party separately retained a life care planner to present information about I.D's future needs. I.D. relied upon Ms. Lynn Trautwein and the Secretary retained Ms. Shelley Kinney. Both have prepared life care plans for numerous Vaccine Program petitioners. I.D. independently consulted a neuropsychologist, Michael

---

[4] For cases in which the vaccinee died, the statute also authorizes an award of $250,000 to the estate of the deceased. Section 15(a)(2).

[5] When the parties required additional time to develop their cases, they requested that the Court extend the time for issuing a decision. The Court granted each of these unopposed motions.

3

Stutts.[6] Dr. Stutts conducted a standard neuropsychological evaluation and wrote a report. Exhibit 29.[7]

The parties' two life care planners asked Dr. Stutts to discuss whether I.D. could work and could live independently. Dr. Stutts responded affirmatively to both queries. In Dr. Stutts's view, "[h]e could live independently with support. 24 hour support is not necessary, but certainly he could benefit from assistance to get up and get started with his day." Dr. Stutts also opined that "[h]e should be able to earn a living, but work will require some accommodations." Exhibit EE.

On March 16, 2012, I.D. filed a life care plan. For daily care needs, I.D.'s life care planner, Ms. Lynn Trautwein, recommended that I.D. be successively assisted by a companion, a live-in companion, and staff at an assisted living facility. Ms. Trautwein also recommended that I.D. have a driver when the companions were not available.

The following reproduces pertinent portions of I.D.'s life care proposal.

---

[6] At a hearing, the petitioner's mother said that she selected Dr. Stutts. Tr. 2183. Dr. Stutts, in turn, stated that he agreed to see I.D. because she was a professional colleague at the Eastern Virginia Medical School. Dr. Stutts also explained that if he had known about the scope of his consultation at the onset, he might have declined to become involved in the litigation. Tr. 2206.

[7] There happen to be two exhibits labeled exhibit 29.

4

| Needs | Age | Cost | Times / year | Petitioner's Annual Costs with Offsets | Rationale from Petitioner |
|---|---|---|---|---|---|
| Companion 4 hours per day on school days (180), 8 hours per day on non school days (185) | 20-26 | $14.50-$17 per hour (Avg $16) | 365 days per year | $35,200 | Requires a driver, assistance with shopping, cooking and nutrition, medication management, organization, encouragement to get out of bed and start the day and other executive functions. Assumes I.D. remains living at home with his parents until he completes college. |
| Live in Companion | 27-65 | $220-$275 per day (Avg. $247.50) | 365 days per year | $88,110 | Requires a driver, assistance with shopping, cooking and nutrition, medication management, organization, encouragement to get out of bed and start the day and other executive functions. Assumes I.D. moves from his parents home at age 27. According to Dr. Fink, I.D. is not able to live independently. |
| Assisted Living | 66-LE | $3,000 - $3,510 per month (Avg. $3,255) | 12 months per year | $39,060 | Assumes I.D. will require increased supervision as he ages. Assisted living is a more cost effective option than live in attendants and will provide I.D. with the company of his peers. |

5

| Driver | 20-LE | $18-35 per hour (Avg $26.50) | 20 hours per month | $6,360 | Although he has a driver's license, I.D. has a history of poor impulse control, reckless driving, has totaled at least 4 cars, requiring court appearances. It is likely the court will revoke his driver's license. According to Dr. Fink, I.D. is an unsafe driver and should not be put in the position of operating a motor vehicle. This driver allowance will be utilized for times when I.D. needs to go out and the companion is off duty. |
|---|---|---|---|---|---|

Exhibit 30 at 6.

6

On March 22, 2012, I.D. filed a Motion for Award of Compensation. I.D. requested the maximum amount for lost wages. He based this request on a statement from Dr. Fink, although his motion did not cite to this statement and it was not in the record at the time I.D. filed the motion. Later, he filed Dr. Fink's statement as exhibit 31, and another statement from Dr. Fink as exhibit 38. I.D.'s motion also requested $250,000 for pain and suffering. The motion did not separate the $250,000 into components for past pain and suffering and future pain and suffering.

The Secretary opposed I.D.'s claim for lost wages and relied upon the opinion of Dr. Stutts. See Resp't Resp., filed Apr. 20, 2012, at 3-4.[8] The Secretary also argued that I.D. was not entitled to $250,000 in compensation for his pain and suffering. The Secretary proposed $50,000 for past pain and suffering as well as $50,000 for future pain and suffering. Id. at 2-3.

In an April 25, 2012 status conference, I.D.'s attorneys stated that they wanted him to see a different neuropsychologist, one in New Jersey. (This neuropsychologist was Gundrun Lange.) The Secretary did not oppose this request, but she reserved the right to obtain her own neuropsychologist. I.D. recognized that the Secretary could consult another neuropsychologist.

At a hearing, Dr. Lange testified that she received telephone calls from petitioner's mother, who was "anxious" and "very emotional." She informed Dr. Lange that her son had chronic fatigue syndrome and that a doctor had determined that he was capable of employment and living independently. She requested that Dr. Lange provide a second opinion. Dr. Lange agreed, although Dr. Lange cautioned that her opinion might not be the one that she wanted. Tr. 2324-25.

Dr. Lange also communicated with one of petitioner's two attorneys. Dr. Lange testified that she requested that they provide all of I.D.'s medical records. The attorney and the petitioner's mother provided six documents, not including material whose source was Dr. Stutts.[9] I.D.'s attorneys also arranged for Dr. Stutts to transfer his raw data to Dr. Lange.

---

[8] The Secretary also challenged the way I.D. calculated the amount of lost wages. In subsequent status conferences, he conceded that the Secretary's proposal was correct. There is no longer a dispute about the way to calculate lost earnings in this case.

[9] Clearly, Dr. Lange did not receive "all" I.D.'s medical records.

Based primarily upon the results of tests Dr. Stutts administered to I.D., Dr. Lange wrote a report that petitioner filed as exhibit 33. Dr. Lange said that I.D. cannot work and cannot care for himself.

Thus, Dr. Stutts and Dr. Lange appeared to have reached different conclusions. The parties requested a hearing. While the parties were looking for mutually convenient dates, I.D.'s attorney communicated with Dr. Stutts and presented him with Dr. Lange's report. Dr. Stutts also discussed the case with Dr. Lange. Dr. Stutts informed I.D.'s attorney that because "Dr. Lange has particular expertise with CFS that I do not, I am willing to defer to her opinions."[10] This statement did not dissuade the Secretary from wanting a hearing and the August 20, 2012 hearing remained as planned.

In an August 16, 2012 pre-trial conference, I.D.'s attorney stated that Dr. Lange had just recently informed him that she had recently learned that she could not testify. The problem stemmed from regulations issued by the Department of Veterans Affairs, which is the agency that employed Dr. Lange. These regulations prevented her from testifying against the United States. I.D.'s attorney stated that he had requested a waiver from the Department of Veterans Affairs. The Department of Veterans Affairs eventually granted this waiver, but not in time for Dr. Lange to testify on August 20, 2012.

At the August 20, 2012 hearing, I.D., petitioner's mother, and Dr. Stutts testified. When the hearing finished, attorneys for both parties expressed an interest in having Dr. Lange testify. Dr. Lange did testify at a hearing held on October 25, 2012, in Newark, New Jersey, a location close to her home.

After the hearing, the parties requested an opportunity to file briefs. I.D. submitted a brief on December 7, 2012, and the Secretary submitted one on December 21, 2012. In the context of responding to I.D.'s argument that he lost all his capacity to earn income through employment, an argument that was heavily based upon the testimony of Dr. Lange, the Secretary argued that "Dr. Lange is not a vocational specialist, and does not have any vocational training." Resp't Br., filed Dec. 21, 2012, at 8 (citing Tr. 2323).

On the topic of I.D.'s pain and suffering, the Secretary continued to oppose an award of the maximum amount. The Secretary argued that I.D. is relatively

---

[10] Initially, I.D. included this email as part of a status report filed on July 16, 2012. He later submitted it more formally as exhibit 36.

better than many other people injured by a vaccine. The Secretary pointed to some activities that I.D. has done, such as attend college, have a girlfriend, and travel internationally. Id. at 4.

Although the filing of briefs was premised upon an assumption that the parties had finished submitting evidence, on December 27, 2012, I.D. unexpectedly submitted a revised life care plan from Ms. Trautwein. Exhibit 44. The revised life care plan prompted another status conference to identify the changes that Ms. Trautwein proposed. Discussions alerted I.D.'s attorneys that Ms. Trautwein had made changes that did not accord with their expectations. Subsequently, I.D. filed revisions to the supplemental life care plan as exhibit 44A.

The revised supplemental life care plan made three changes, all of which concern the amount of companion services from age 22-26. First, Ms. Trautwein proposed that for 365 days a year, I.D. have 10 hours of coverage. Second, for 21 days a year, Ms. Trautwein allotted I.D. an additional 14 hours of coverage to allow his parents to have three weeks of respite coverage. Third, in light of the additional companion coverage, Ms. Trautwein eliminated the driver for I.D.. Exhibit 44A; see also exhibit 44. The Secretary continued to maintain that the amount of companion coverage provided in her life care plan was reasonable. See exhibit DD at 12-13.

In the January 4, 2013 status conference, the undersigned also discussed the Secretary's argument that the evidence purporting to support I.D.'s claim for lost earnings appeared incomplete. Although I.D. had submitted reports and testimony from Dr. Stutts and Dr. Lange, these neuropsychologists are not vocational specialists. Thus, the qualifications of Dr. Stutts and Dr. Lange to discuss how I.D.'s abilities (or, more precisely, his disabilities) affected his capacity to earn income through employment were questionable. See Resp't Br., filed Dec. 21, 2012, at 8. The undersigned explained that I.D. should consider presenting the opinion of a vocational counselor.[11] The undersigned also encouraged the Secretary to consider retaining a vocational specialist.

On March 4, 2013, I.D. filed a report from Ms. Kathryn Reid, a certified vocational counselor. Her opinion was that I.D. could not hold any meaningful employment. Exhibit 46.

---

[11] Both life care planners recommended that I.D. receive vocational training. Exhibit 44 at 6, exhibit DD at 9.

An ensuing status conference concerned the deadline for any response from the Secretary. The Secretary expected that she would file a response by March 22, 2013. But, on that day, she submitted a status report stating that "respondent elects not to file a responsive vocational expert report. Respondent respectfully requests that the Special Master complete his determination on damages based on the current record."

Another status conference was held on March 27, 2013. Four topics were discussed: lost earnings, pain and suffering, the life care plans, and the form of the award. First, the Secretary confirmed that she did not object to an award for lost earnings as long as the award followed the statutory formula. The Secretary stated that she would submit a proposal. Second, in regard to the calculation for pain and suffering, the Secretary reported that the Department of Justice was considering how to respond to Graves v. Sec'y of Health & Human Servs., No. 02-1211V, --- Fed. Cl. ---, 2013 WL 1095510 (Fed. Cl. Feb. 25, 2013), a decision that held the special masters' long-standing approach to awarding pain and suffering was "not rooted in the statute or precedent, and its application . . . was legally deficient." Graves, 2013 WL 1095510, at * 11. I.D. requested an opportunity to address Graves, which he did in a supplemental brief filed on April 8, 2013. Third, for the life care plans, the parties stated that they were attempting to reach a comprehensive compromise. Fourth, I.D.'s attorney reported that I.D. had agreed to an arrangement in which the Secretary would purchase an annuity that would periodically deposit money into a trust for I.D.'s benefit.

After I.D. filed his brief regarding the proper calculation of pain and suffering in light of Graves, another status conference was held on April 9, 2013. The Secretary requested six calendar days to file a response if the parties' efforts to resolve the case through compromise did not succeed.

On April 15, 2013, the Secretary filed a response concerning pain and suffering awards after Graves. The Secretary argued that "to the extent petitioner interprets Graves to endorse a methodology that would result in the vast majority of Vaccine Act claimants recovering the statutory maximum for pain and suffering (subject to net present value calculations), respondent disagrees because that is clearly inconsistent with the legislative history." Resp't Resp., filed Apr. 15, 2013, at 3. The Secretary's view of the methodology of placing awards for emotional distress on a continuum is not especially clear. In the last paragraph of the brief, the Secretary recommended that "the Special Master . . . consider the entire record, draw from his reservoir of past experience with Program cases, and articulate a rational basis for his conclusion." Id. at 9-10.

10

With the filing of those briefs, the issues are ready for adjudication. For each of the four categories of damages, this ruling will set forth the amount of compensation to which I.D. is entitled without reducing any amount to the net present value. As discussed in several status conferences, the undersigned expects that the parties will cooperate in performing the necessary mathematical calculations to reduce the award to net present value. After the parties submit a comprehensive proposal, the undersigned will issue a decision awarding I.D. compensation.

## Future Unreimbursable Medical Expenses

To present evidence regarding future medical expenses, the parties relied upon life care planners – Ms. Trautwein for I.D. and Ms. Kinney for the Secretary. Each submitted reports summarizing their positions. The plans agree on almost all points. The topic on which Ms. Trautwein and Ms. Kinney most greatly disagree concerns attendant care.

When petitioners have established the need for some form of attendant care, the costs for that care have been included in decisions awarding compensation in the Vaccine Program. The pertinent statutory language that authorizes this item of compensation is:

> Compensation . . . for a vaccine-related injury . . . shall include the following:
> (1)(A)  Actual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses which–
> (i)      result from the vaccine-related injury for which the petitioner seeks compensation,
> (ii)     have been or will be incurred by or on behalf of the person who suffered such injury, and
> (iii)    (I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or
> (II) have been or will be for rehabilitation [etc].

Section 15(a). A critical aspect is that the item of care be "reasonably necessary."

Special masters have characterized this phrase as a "vague instruction" and a standard for which there is "no precise" definition. Bedell v. Sec'y of Health &

11

<u>Human Servs.</u>, No. 90-765V, 1992 WL 266285, at \*4 (Cl. Ct. Spec. Mstr. Sept. 18, 1992). A very early decision in the Vaccine Program explained that the term "reasonably necessary" meant

> that an award should provide compensation beyond that which is required to meet the basic needs of the injured person in the compensable areas but short of that which may be required to optimize the injured person's quality of life. What is reasonably necessary lies somewhere between that which is "indispensable" and that which is "advantageous."

<u>Scheinfield v. Sec'y of Health & Human Servs.</u>, No. 90-212V, 1991 WL 94360, at \*2 (Cl. Ct. Spec. Mstr. May 20, 1991). Very few decisions in the Vaccine Program have determined whether a particular level of attendant care is "reasonably necessary."[12]

Here, Ms. Trautwein proposed an assistant who could help I.D. with chores such as driving, shopping, cooking, and getting out of bed. The type of assistant varied across three projected stages of I.D.'s life. From age 20-26, when I.D. was assumed to be living with his parents, the life care planner recommended a "companion." As originally proposed, the companion would provide assistance four hours per day on days I.D. went to school and eight hours per day on non-school days. From age 27-65, Ms. Trautwein assumed that I.D. would not be living with his parents, but also not living in a group home. For these 38 years, she recommended a "live in companion" for 365 days a year. From age 66 to life's end, Ms. Trautwein indicated that I.D. would live in an "assisted living" facility. In addition to the assistant, she separately recommended that I.D. have a driver available 20 hours per month. The reason given was that I.D. was an unsafe driver and he may need to go out when the companion is off duty. Exhibit 30 at 6.[13]

---

[12] The primary reason why special masters have written so few decisions addressing attendant care is that once a case reaches the stage in which damages are being determined, the parties have almost always compromised their positions. These agreements have reduced the litigation over items of compensation. The credit for these agreements belongs to the attorneys and the life care planners whom they employ.

[13] As discussed in the procedural history, I.D. submitted a revised life care plan that increased the number of hours recommended for companion care from

The Secretary's life care planner, Ms. Kinney, proposed an alternate arrangement. In the Secretary's view, a better plan would be to have the assistance of a homemaker for five hours per day. I.D. would have a homemaker every day of the year for the remainder of his life. I.D. would not live in an assisted living facility. The homemaker would perform duties such as getting I.D. up and moving, planning his meals, driving, cleaning, and shopping. Because of the homemaker, the Secretary contended that I.D. did not need a driver. Exhibit DD at 12-13.

In another case that involved competing proposals for attendant care, the special master aptly summarized the dilemma in determining what is "reasonably necessary:"

> The appropriate resolution of this dispute is certainly not obvious. No mathematical formula exists for choosing a figure. Rather, the resolution is inherently one involving the exercise of judgment and discretion. The fact is that [the injured child] could conceivably be cared for at many different cost levels.

Bedell, 1992 WL 266285, at *4.

A close examination of the record reveals that the parties are not so far apart, at least in their original positions. For the first period, ages 20-26, I.D.'s life care planner recommends a "companion" for either four hours per day or eight hours per day, depending on whether I.D. is in school. In this same period, the Secretary's life care planner recommends a "homemaker" for five hours per day. The difference between a "companion" and a "homemaker" appears to be a semantic one in that each life care planner asserts that the average hourly wage for their person is $16.00. An award for an assistant whose wage is valued at $16.00 per hour will permit I.D. to employ either a "companion" or a "homemaker."

---

ages 20-26 to ten hours per day. The justification was that Ms. Trautwein had reviewed the testimony of Dr. Lange. See Exhibit 44 and exhibit 44A.

Ms. Trautwein has not persuasively explained why Dr. Lange's testimony affected her opinion. There are at least two problems. First, Ms. Trautwein's original proposal was based upon Dr. Fink's assertion that "I.D. is not able to live independently." Exhibit 30 at 6. To the extent that Dr. Lange expressed a similar opinion, her opinion is redundant with Dr. Fink's assessment. Second, to the extent that Dr. Lange reached a different opinion, Dr. Lange's position is based upon incomplete and inaccurate information about I.D..

13

The dispute is really about whether I.D. should have an assistant for eight hours a day on days when he is not attending classes at Old Dominion University, as he requests, or for only five hours, as proposed by respondent.[14]  I.D. has not explained why four hours of attendant time is reasonable for when he attends school, but more is needed when he is not in school.  The tasks for which an attendant is needed include: (1) getting I.D. out of bed, (2) planning his day, (3) planning his meals, (4) providing assistance with daily living tasks such as shopping and paying bills, (5) driving him to school, and (6) cleaning his house.  Five hours per day, seven days a week, is an amount of assistance that is above a bare minimum yet still below the highest imaginable.  Therefore, I.D. is awarded five hours per day, seven days per week during the first period.

To this award, the undersigned will add an additional eight hours per day for 21 days a year.  This award is intended to allow I.D.'s parents a respite from caring for him.  This respite, in turn, will enable them to continue to care for their son as well as possible.

For the next phase of I.D.'s life, Ms. Trautwein contends that he needs a live-in companion to replace the companion.  The recommended amount of care (and costs for that care) are the same in Ms. Trautwein's original life care plan and her revised supplemental life care plan.  Compare exhibit 30 at 6 with exhibit 44A at 2.  She lists the cost of the live-in companion as $247.50 per day on average.[15]  The tasks for which the live-in companion will assist I.D. – shopping, cooking, driving, and encouraging I.D. to get out of bed – are the same in this period as the previous period.

I.D. has failed to offer a persuasive reason why he needs continuous (or nearly continuous) care.  According to his most recent transcript from Old Dominion University, he earned A's and B's.  On the intelligence test given to him by Dr. Stutts, I.D.'s worst score placed him in the "average" range.  In the three remaining areas, he scored "very superior," "high average," and "superior." Exhibit 29 at 3-4; exhibit 41 at 5.

[14] The Secretary's life care planner proposed five hours of care while I.D. is attending school.  His life care planner originally proposed four hours on these days.

[15] Ms. Trautwein did not list a particular hourly rate or a particular number of hours.  If the hourly rate for companion services is used ($16.00 per hour), then the average daily rate ($247.50) equates to approximately 15.5 hours per day.

On the other hand, I.D. will eventually be required to transition out of his parents' house. At this stage, someone other than I.D.'s mother and father will need to assist him. Consequently, the undersigned will double the amount of attendant care services from five hours per day to ten hours per day. Because I.D. will not be living with his parents in this phase of his life, Ms. Trautwein has not recommended any respite care during this period.

In the third phase, I.D.'s life care planner recommends placement in an assisted living facility because she "assumes I.D. will require increased supervision as he ages." Exhibit 30 at 6. The Secretary's life care planner neither questioned this assumption nor accounted for this change. The proposal for assisted living is accepted as reasonable.

Ms. Trautwein also originally requested that in addition to I.D.'s companion, he be compensated for the costs of retaining a driver to assist him when his companion is off duty. The rationale is that he "has a history of poor impulse control, reckless driving, has totaled at least 4 cars, requiring court appearances." Exhibit 30 at 6. The basis for these statements is not clear. However, I.D.'s testimony, which was given after the life care planner made her recommendations, contradicts these assumptions. Tr. 2106-10.[16]

The evidence about I.D.'s driving record depends upon his testimony. (Neither party submitted information from the Virginia Department of Motor Vehicles.) Although I.D.'s recollection was sometimes spotty, his testimony regarding the four cars was very clear. He was not responsible for damage to any of the cars. Thus, these no-fault accidents do not support a finding that I.D. cannot operate a car. Furthermore, the ten hours of daily attendant care can be used for transportation.

In all other respects, the undersigned adopts the position taken by Ms. Kinney for the reasons sets forth by Ms. Kinney. See exhibit DD.

---

[16] Specifically, I.D. testified that he did not recall being involved in any accidents in which he hit another car. Two cars failed because of equipment problems (blown head gasket and bad oil pump). A third car became inoperable because a truck rear-ended it. I.D. did not recall any particular accidents with a fourth car.

15

## Past Unreimbursable Medical Expenses

I.D. collected information about past unreimbursable medical expenses very slowly.  In several status conferences, his attorneys represented that they would request information from their client or had requested information from their client.  Eventually, I.D. claimed approximately $7,000 in unreimbursable medical expenses.  Exhibit 32.

However, the Secretary challenged many of these items.  The primary reason was that I.D. failed to establish that the cost was for medical treatment associated with his vaccine-induced injury, chronic fatigue syndrome.  The Secretary accepted items totaling $1,787.69.  See exhibit FF, filed June 11, 2012.

In the subsequent months, I.D. provided additional support for some items, totaling $1,119.61.  See exhibit 42.  Consequently, I.D. is awarded, for past unreimbursable expenses, $2,907.30.

## Lost Earning Capacity

Because the hepatitis B vaccine caused I.D. to suffer chronic fatigue syndrome before he was 18 years old, I.D. is eligible to receive compensation for his "impaired earning capacity" as defined in section 15(a)(3)(B).  As discussed in the procedural history, a great amount of time was spent on this issue.  Even after the Dr. Stutts and Dr. Lange testified, the Secretary perceived a gap in I.D.'s proof.  I.D. completed his claim for lost earnings by presenting the report of a vocational counselor, Ms. Reid.

After Ms. Reid's report, the Secretary declined to challenge I.D.'s entitlement to compensation for his lost earnings.  The Secretary noted that any award needed to comply with the limits set forth in the statute.  I.D., in turn, did not seek an award that exceeded the authorized amount.

Consequently, the undersigned awards I.D. the amount of compensation for his impaired earning capacity as set forth in the statute.  The parties are instructed to include this amount in the sums reduced to net present value.

## Pain and Suffering and Emotional Distress

The fourth category of compensation to which I.D. is entitled is an award for his "pain and suffering and emotional distress from the vaccine-related injury."

16

Because this item is the most strenuously disputed one, the analysis is relatively more detailed.

<u>Standards for Adjudication</u>

Compensation for a vaccine-related injury includes that "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The text of the statute divides the award into two components – "actual" and "projected." The portion of the award designated for projected pain and suffering (sometimes known as future pain and suffering) must be discounted to net present value pursuant to section 15(f)(4)(A). <u>Youngblood v. Sec'y of Health & Human Servs.</u>, 32 F.3d 552, 555 (Fed. Cir. 1994).

Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula. Nevertheless, in one case relatively early in the Vaccine Program, a special master identified three factors that are useful in attempting to make this quantification somewhat more objective. These factors are "[(1)] the ability to understand the injury, <u>i.e.</u>, the injured's mental faculties are intact; [(2)] the degree of severity of the injury; and [(3)] the potential number of years the individual is subjected to the injury." <u>McAllister v. Sec'y of Health & Human Servs.</u>, No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), <u>vacated and remanded on other grounds</u>, 70 F.3d 1240 (Fed. Cir. 1995).

For many years, special masters placed awards of emotional distress on a continuum so that the people who have suffered the most received the greatest award. <u>See, e.g.</u>, <u>Hocraffer v. Sec'y of Health & Human Servs.</u>, No. 99-533V, 2007 WL 914914, at *4 (Fed. Cl. Spec. Mstr. Feb. 28, 2007) ("In making this award, the undersigned considered not only the facts of this particular case, but also compared this case to other awards the undersigned has made and awards made by my colleagues."), <u>motion for review granted in part and remanded</u>, 2007 WL 5180525, at *4 (Fed. Cl. July 13, 2007) (permitting petitioner to submit additional evidence), <u>decision after remand sub nom.</u>, <u>Doe/34 v. Sec'y of Health & Human Servs.</u>, 2009 WL 1955140 (Fed. Cl. Spec. Mstr. Mar. 4, 2009) (reinstating original damages decision), <u>motion for review denied</u>, 87 Fed. Cl. 758, 768 (2009) (stating "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the amount of damages in this case"), <u>aff'd sub nom.</u>, <u>Hocraffer v. Sec'y of Health & Human Servs.</u>, 366 Fed. App'x 161 (Fed. Cir. 2010); <u>see also</u> <u>Long v. Sec'y of</u>

17

Health & Human Servs., No. 94-310V, 1995 WL 470286, at *12 (Fed. Cl. Spec. Mstr. July 24, 1995). Special masters have reasoned that Congress capped the amount of emotional distress at $250,000. According to the committee endorsing the proposed legislation, it did "not intend that all petitions for which compensation is awarded be given this maximum level but rather that the Master consider the individual pain and suffering of the injured person, as well as the benefits conferred by other forms of compensation within the legislation." H.R. Rep. No. 99-908, at 21 (1986), reprinted in 1986 U.S.C.C.A.N. 6344, 6362.

In Graves, petitioners successfully challenged this approach recently. After I.D. and the Secretary had filed their briefs regarding pain and suffering, the Court of Federal Claims held that the policy of placing awards of emotional distress on a spectrum "is not rooted in the statute or precedent, and its application . . . was legally deficient." Graves, 2013 WL 1095510, at * 11. Under the interpretation of the statute offered in Graves, cases that used the spectrum approach, such as Hocraffer and Long, are no longer useful measuring points.

However, Graves appears to have accepted the three factors relevant to measuring pain and suffering that were identified in McAllister. Graves, 2013 WL 1095510, at *11. Thus, "severity of injury, awareness, and duration of the suffering" continue to be valid criteria to assess the evidence in a particular case.

Evidence

Here, evidence regarding I.D.'s pain and suffering is found in three sources. First, there are medical records created contemporaneously with the events being described in those records. These types of records are "favor[ed]" in the Vaccine Program. Shapiro v. Sec'y of Health & Human Servs., 101 Fed. Cl. 532, 537 (2011) (citing Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993)). Dr. Fink's records of treating I.D. help in understanding his physical and mental well-being. See exhibits 5 and 11(a). Second, there is the testimony of I.D. and his mother. In the August 20, 2012 hearing, they provided their recollections of how I.D. fared since his November 5, 2001 hepatitis B vaccination. Third, there are indirect sources of information about the pain and suffering people may have in the future. Informative opinions came from Dr. Stutts, Dr. Lange, Ms. Reid, Dr. Fink, Dr. Bell, Dr. Oleske, and Dr. Parker.

After considering this evidence, the undersigned finds that a reasonable award for past pain and suffering is $100,000. I.D.'s chronic fatigue syndrome began in November 2001. His emotional distress, therefore, has been continuing

for more than 12 years.  His chronic fatigue syndrome kept him from attending high school as his peers did.  He also is not living at college.  These missed experiences warrant compensation.  Throughout this period, I.D. was required to adjust to his decreased functioning and wondered why these problems were afflicting him.  Since I.D. was relatively young, he probably felt these problems more acutely than people whose age and experience permit a greater understanding.

The undersigned also awards $150,000 in future pain and suffering.  The undersigned does not make any specific finding as to the amount of future pain and suffering that would be appropriate if the statute did not cap the amount of total pain and suffering at $250,000.  It is sufficient to note that the unfettered amount would exceed $150,000.

The award of the statutory maximum takes into consideration the duration of I.D.'s pain and suffering.  The parties have not cited any evidence that suggests that chronic fatigue syndrome shortens a person's life span.  Thus, the undersigned assumes that I.D.'s pain and suffering will extend for decades.  Throughout this span, I.D., as a relatively high-functioning person, will be aware that his chronic fatigue syndrome prevents him from working and prevents him from enjoying all life's pleasures.  Therefore, for two of the relevant factors (duration and awareness), I.D. scores, unfortunately, very high.  This strong showing offsets a relatively weaker mark with respect to the severity of the suffering.

For these reasons, I.D. is awarded the maximum amount possible under the statute – $250,000.00.  The award is divided into an amount ($100,000) that does not have to be reduced to net present value and an amount ($150,000) that must be reduced to net present value.[17]  The parties are instructed to reach an agreement regarding the appropriate discount rate for the pain and suffering component in

---

[17] While the Secretary contends that the legislative history indicates that the majority of petitioners in the Vaccine Program should not receive the statutory maximum, see Resp't Resp., filed Apr. 15, 2013, at 3, it is unclear how the methodology articulated in Graves and followed here would prevent awards at the statutory maximum.  One simple reason is inflation.  When special masters award compensation for pain and suffering before considering the statutory cap, the amount awarded in current cases is likely to exceed the cap, which was created more than 20 years ago.  If the Secretary contends that the methodology in Graves is in error, then the Secretary's recourse is to appeal.

accordance with the April 25, 2011 order. If the parties are unable to reach an agreement, the issue will be addressed at the status conference scheduled below.

## Conclusion

This ruling is intended to resolve the disputed issues. The parties are ORDERED to confer to reduce the portions of the award to the net present value. In doing so, the parties are reminded that the Court's deadline for a decision is currently set at April 30, 2013. See order, filed January 22, 2013. The Secretary shall file a status report on this topic by **Thursday, April 25, 2013**. A status conference will be held on **Friday, April 26, 2013 at 10:00 Eastern Daylight Time.** The Office of Special Masters will initiate the call.

**IT IS SO ORDERED.**

s/ Christian J. Moran
Christian J. Moran
Special Master